The opinion of'the cofirt was-delivered.by."
Watkins J.
The .plaintiff ’s'suit.is for the revocation and forfeiture of the defendant’s charter.,;-om the., ground. and for the-reason *939 that it has committed acts- ultra vires and-transcended the powers granted by its charter, and conferred upon it-by law, in that the corporation, through its officers and agents, has fostered, encouraged and maintained exhibitions of what is “ commonly called prize fighting,” in violation of the ' Constitution and'laws of this ■State.
Accompanying the foregoing averments is a prayer for an injunction, restraining and prohibiting the corporation, its officers an agents from maintaining, fostering and encouraging such exhibitions ; and also enjoining and prohibiting the defendant from selling •or disposing of its property pendente lite.
The prayer is concluded by demand for the appointment of a receiver to take charge of its assets and property, and to liquidate and wind up its affairs.
In the petition are -set forth the various objects and purposes ■of the defendant’s organization, as they are enumerated in its charter and the amendment thereto — such as the establishment and maintenance of rooms for literary purposes, for the collection of valuable*works of art, books, maps, charts, statuary, coins, etc.; for the promotion of social intercourse, enjoyment, comfort, harmony, refinement of manners and intellectual improvement; to entourage physical culture and development of athletic exercises— such as boxing, wrestling, fencing, and exhibitions of athletic sport; •to organize one or more military companies, to promote and main■.itain a natatorium, gymnasium, athletic grounds, rowing clubs, bowling alleys, and such other features as may be found neces■sary to fulfil the purposes for which this corporation is formed,
Then follows the averment that, -1 ‘ the acts of the incorporation were a fraud upon the laws of the State — the vague and indefinite language employed to express the objects and purposes of the club (being) purposely used to cloak, cover up and conceal the real objects for which said corporation was organized,” as set out supra.
As adjuvatory of the foregoing allegation, the further averment is made that the defendant is accustomed to offer large prizes, or rewards, to noted pugilists of other States and countries, and its arena has been the scene of prize fights that were participated in by ’ them — intending to fight until'one of the contestants should give in - from sheer exhaustion or injuries received-; that the fights were wit..nessed by.large assemblies of persons, there unlawfully congregated *940 for the purpose of encouraging same, who were compelled to pay entrance fees for admission to said exhibitions.
It is then further averred that such unlawful assemblies and acts— which were public nuisances — were instigated and maintained by the club. That “ these disgraceful exhibitions have attracted to this city a large number of noted thugs, confidence men and criminal characters from other cities and States, thereby endangering the public peace and menacing the security of life and property.”
That “ these exhibitions are and have been an incentive to-gambling, and large sums of money have been bet, wagered and staked on the result thereof;” and that the defendant “ has been offering and paying large sums of money to noted pugilists^ and has caused and encouraged them thereby to commit assault and battery upon each other;” and that “said prize fights set evil examples to the young, discourage honest industry by disproportionately rewarding sanguinary exhibitions of brute force — all of which are public nuisances.”
It is then alleged that a large number of said exhibitions have taken place at the club house of the defendant, by the direction and under the sanction and authority of its officers and agents, and that “ the said exhibitions of what is commonly called prize fights ” have taken place on the dates and between the participants named in the ■accompanying list, to-wit:

*941

The petition further and finally alleges that, in conjunction with said exhibitions or prize fights, the defendant, on occasions on which same occur, operates and conducts a bar-room and retail liquor establishment upon its premises without paying a license to the State, as required by law.
The defendant moved to dissolve the injunction on several grounds, to-wit:
1. That the injunction was not justified by the facts and allegations contained in the petition.
2. That the writ was improvidently issued and without cause.
3. That the petition sets forth no cause for or right to an injunction.
4. The allegations on which the injunction was demanded are untrue.
5. That the plaintiff is estopped by her conduct and allegations in the suit of same title as the instant one, for the recovery of a license.
Oontemporaneously therewith, the defendant filed exceptions to the suit of no cause of action, prescription of one year, and estoppel laid on aforesaid record.
All of said exceptions were cumulated with the merits and tried together, the defendant having in the meanwhile filed an answer, alleging that it was “ and is a solvent and existing corporation, lawfully established, and is in the legal and actual possession of all its property, rights and privileges, and has in no manner abandoned the same, or incurred any liability to forfeiture thereof.”
The case was tried by a jury, who returned a verdict in favor of the defendant, and plaintiff has appealed.
*942 A fair summary of the charges made by the plaintiff, upon the proof of which the forfeiture of defendant’s charter and the perpetuation of her injunction depend, is as follows, to-wit:
First: That the corporation had committed acts .ultra vires, and transcended the powers conferred upon it by its charter and the law, by encouraging and maintaining exhibitions of what is “ commonly called prize fighting,” in violation of the Constitution and the law.
■.Second: That the defendant is accustomed to offer large prizes or rewards to noted pugilists, and its arena has been the scene of prize fights that have been participated in by them — intending to fight until one of the contestants should give in from sheer exhaustion or injuries received — and which were witnessed by large assemblies of people, unlawfully congregated for • the purpose of encouraging same; which assemblies and acts constituted public nuisances, and same were instigated and maintained by the defendant.
Third: That these exhibitions have attracted a large number of : noted thugs, confidence men and criminal characters from other cities and States, thus endangering the public peace.
■Fourth: That these exhibitions are and have been an incentive to gambling, and large sums of money have been wagered and staked on the .result thereof; and the defendant has been offering and paying large sums of money to noted pugilists, thus causing them to commit assault and battery.
Fifth: That, in conjunction with said exhibitions or prize fights, the defendant operates a bar-room and retail liquor establishment upon its premises, without paying a license to the State.
The gravamen of the suit is found in the first specification, and is ' to the effect that the defendant committed acts ultra vires of its charter, by encouraging and maintaining on its premises and within its club room “ exhibitions of what is commonly called prize fighting, in violation of the Constitution and law — thus making its acts of incorporation a fraud on the law.
The remaining four specifications relate to the collateral incidents and surrounding circumstances illustrative of the exhibitions, as an aggravation of the charge complained of.
The solution of the question propounded by this action depends Jií'ét upon á correct and proper interpretation of the phrase “ exhibitions that are commonly called prize fights; ’ ’ and second upon a just • *943 interpretation of the laws which are alleged to have been thereby violated. • ■’ - ''
As pointing the issue thus formulated we make the subjoined ex- ' tract from the plaintiff’s brief, viz.:
• “ The questions at issue may be stated thus: Were these piigil'istie fights for prizes, held in the arena of the Olympic Club;'within the legitimate objects and purposes- of the charter, or were they such abuses of its franchises as would justify a-perpetual-injunction and a decree of forfeiture of the charter and the appointment of a receiver to’sell’its property and distribute its proceeds among creditors and stockholders?
•“-Were they not ‘what is commonly called prize fights;’ and did not each fight constitute the crime or offence of assault and battery- and breach of the peace ; and were they not in violation of the law and public policy of the State ? or were they lawful exhibitions of ■ skill in boxing, permissible under the law, or as the defendant is pleased to call them ‘ glove contests,’ whatever precisely that may mean.” '
The provisions of Act 25 of 1890 are referred to and relied’ upon as having been violated by the defendant, and same are' distinctly-invoked and quoted by the plaintiff’s counsel as the basis of'this proceeding.
That act is couched in the following terms, to-wit:
“ Act No. 25 of 1890, defining the crime of prize fighting and to provide for the punishment thereof in and out of the Sta£e of Lou-' isiana.
“ Section 1. Be it enacted by the General Assembly of the State" of Louisiana, That any person who shall send or cause to be’ sent, publish or otherwise make known, a challenge to fight what is commonly called a prize fight, or who shall accept any such challenge; or who shall engage in-such fight, or act as trainer for any such, contemplating a participation in such fight, and any such person who’ shall act as aider or abettor, backer, umpire, second; surgeon or assistant at such fight, or in preparation for such fight, shall, Upon conviction thereof, be deemed guilty of a misdemeanor and be punished by imprisonment in the parish jail for not more than six months,- and be fined not more than five hundred dollars.”
(Section 2 is omitted as unimportant.) But to this section is'appended the following provisoj to-wit : .
*944 “Provided this act shall not apply to exhibitions and glove contests between human beings which may take place within the rooms of regularly chartered athletic clubs.”
Previous to the promulgation of this act on the 25th of June, 1890, an ordinance was adopted by the City Council of New Orleans, of the following tenor and purport, to-wit:
“Be it Ordained by the City Council of the City of New Orleans, That Ordinance .No. 1194 be and the same is hereby amended so as to read as follows:
“ That exhibitions and glove contests between human beings for the development of muscular strength be and the same are hereby permitted to take place within the rooms of all regularly chartered athletic clubs in the City of New Orleans, provided that at the time when said exhibitions and glove contests shall take place that the sale or giving of spirituous liquors in said club rooms is hereby prohibited; and provided further, that all such exhibitions and glove contests shall be under the supervision of the police authorities of the City of New Orleans; and provided further, that a glove weighing not less than five ounces shall be used in such exhibitions or contests ; • but under no circumstances shall this ordinance be construed as permitting any sparring contests in such club or clubs on Sunday; provided further, that for each exhibition the parties shall be required to donate fifty dollars for fund of public charities of New Orleans; and that a good and solvent bond of five hundred dollars cash shall be given, to be forfeited in case of- any violation of said ordinance, the proceeds of said forfeited bond to go to the said fund of public.charities.”
The foregoing ordinance bears the number 4886, C. S., and was adopted by the City .Council on March 5, 1890.
It was with direct reference to this ordinance, and the act of the General Assembly, that the defendant procured an amendment to its original charter, whereby on the 16th of May, 1891, it was reincorporated as a stock company, the objects and purposes of the corporation being therein enumerated as set out in plaintiff’s petition.
From,. the City Ordinance it appears “ that exhibitions and glove contests -between human beings, for the development of muscular strength,” was “ permitted to take place within rooms of regularly chartered-athletic clubs in the City of NewOrleans;” coupled, however, with the proviso “that all such exhibitions and glove contests *945 shall be under the supervision of the police authorities;” and with the further proviso “ that a glove weighing not less than five ounces shall be used in such exhibitions, or contests.”
The denunciation of the Legislature was addressed to “what is ■commonly called a prize fight,” and declares that any one who shall send or accept a challenge to make such a fight shall be deemed guilty of a misdemeanor, and punished accordingly ; but it was careful to insert the proviso that it should not apply to exhibitions and glove contests which may take place in regularly chartered athletic clubs.
Having reproduced the allegations of the petition, the averments of the answer, the purport of the argument, the provisions of the Oity Ordinance and of the statute of the General Assembly, and the provisions of the defendant’s charter, the conclusion is plain that our decision must turn upon the distinction that is taken in the statute and ordinance between a glove contest and what is commonly called a prize fight; for upon this distinction depends the criminality vel non of the contests which took place between the combatants. And it is equally clear that unless these combatants are proven guilty of the acts denounced in the statute as a misdemeanor, the defendant can not be treated as particeps criminis and its charter revoked and like contests enjoined.
This brings us to the consideration of the evidence that was ad - duced, pro et con, in the lower court, and the various rulings of the .judge a quo with reference to admissibility of testimony.
And, as a preliminary to this examination, it is well to incorporate one of the contracts under which the club contests occurred, as the best means of illustrating its character; and the following is selected .as a sample, to-wit:
“OLYMPIC CLUB.
“Articles of Agreement Between Stanton Abbott and Andrew Bowen.
“ We, the undersigned, Stanton Abbott, of London, England, and Andrew Bowen, of New Orleans, La., do hereby agree to engage in a glove contest to a finish before the Olympic Olub, of New Orleans, La., on November 15, 1893, at 9 o’clock p. m. sharp, for a purse of two thousand five hundred dollars, the winner to receive two thousand dollars, and the loser five hundred dollars of said purse,-said *946 Bowen and Abbott to receive each three hundred dollars for expenses-, as soon as forfeit of five hundred dollars is deposited with the Olympic Olub.
“The contest to be with five-ounce gloves and according to Marquis of Queensbury rules. The club is to select the referee and official timekeeper, each of us reserving the right to. appoint a timekeeper to represent us, said timekeeper to be subject to the-approval of the club. The referee shall have the power to stop and decide the contest when so directed by the seconds and the contest committee.
- “ Should either of us commit a deliberate foul, thereby injuring-the other’s chances of winning, the one so doing shall lose all interest in the aforesaid purse.
■ “We each hereby agree to weigh one hundred and thirty-three pounds at the ring side at 9 o’clock p. M. on day of said contest.
“To guarantee the faithful performance of the above obligations-we each hereby agree to deposit the sum of five hundred dollars in the hands of the Olympic Club. Should, either of us fail to appear at the proper time and place, the one so doing shall forfeit his deposit-to the club.
(Signed) “A. Bowen,
“Stanton Abbott,
“ Jno. W. Lyons.
“ Witnesses:
“ Thos. O. Anderson,
“ Alb. Spitzfaden,
■ “ Teddy Wilson.
' “ Date September 26, 1893. ”
During the progress of the trial question was made with regard to. the admissibility of testimony on the part of the defendant, as tending to show a difference between a prize fight and a glove contest. The judge a quo ruled in favor of the defendant and admitted the evidence, and the plaintiff reserved a bill of exceptions.
After the evidence had gone to the jury the same question was presented again, in certain requested instructions to the jury, that were presented by the plaintiff’s counsel, and refused by the court. To be accurate, we will incorporate the pertinent portions of the-charge requested, which is as follows, viz:
“The plaintiff requests the Judge to charge the jury as follows:
*947 “ 1. The statute of this State, which applies to both persons and' corporations, prohibits prize fighting, and makes it a penal offence; and also provides that this statute shall not apply to exhibitions and glove contests between human beings which may take place within the rooms of regularly chartered athletic clubs.
“All parts of this statute, as well as every other law, must be so construed as to harmonize with each other, and I charge you, gentlemen of the jury, that the term ‘ prize fighting ’ does not require any definition — it is a simple term defined in all the dictionaries to be fighting for a prize or reward, and if the jury believe from the evidence that the defendant corporation held one or more fights within its arena, under the auspices of its officers and managers, in which the fighters were offered or promised a prize or reward to be paid to the victor, or either of them, such a fight is a ‘ prize fight’ within the meaning of the law, and is unlawful, whether the-combatants wore gloves or not.
“ It matters not what the rules of the fight were, or how they were clothed, or whether any portions of their bodies were covered or uncovered — if they fought to a finish for a prize, or reward, to be given to the successful combatant, it is a prize fight within the meaning of the law, and the verdict must be for the plaintiff.
“The Legislature can not be presumed, in prohibiting prize fighting, to have enabled any one to escape the prohibitory or penal clauses of the statute, by putting on and wearing a pair of gloves, and thereby evading the penalty prescribed by the law for its infraction.”
But, to our thinking, the foregoing requested special charge was modified, and the admissibility of sueh evidence — partially, at least— conceded by the third and fourth requested special charges, which are as- follows, viz.:
. “I charge you, gentlemen of the jury, that if from the, evidence you find that the defendant in this case contracted or agreed with certain noted pugilists, residing here or coming here from other States or countries, to engage in a fight for a prize or reward, in the arena of their club, and at .such contests the fights were carried on to a,finish, and the reward previously promised was subsequently paid to the successful combatant, then this was a ‘ prize fight,’ and your verdict should be for the plaintiff. . ,
“ If it were a mere exhibition of shill in sparring with gloves, not *948 calculated to do great bodily injury, it was a glove contest within the provision of the law; but if the jury believe from the evidence that the parties who have engaged in these contests within the arena of the defendant intended to fight until one gave in from exhaustio n or injuries received, it was a breach of the law, and a prize fight, whether the combatants fought with gloves or not.
“Gentlemen of the jury, you are to decide this case from, the evidence adduced on the witness stand as to what actually occurred at the time the several contests or fights referred to in the petition, and testified to by witnessess, took place, and not by your preconceived opinions, or the opinions of any other person, as to whether these contests were prize fights or not. In other words, you are to decide this case upon the facts proven by the testimony of the witnesses on the stand, and the law as given to you by the court, and not in accordance with your preconceived opinions, or according to the opinion of any one else.”
Taken collectively, we understand the objection of plaintiff’s counsel to be, that it was permissible for witnesses to state the facts and incidents which actually occurred, as coming within the range of their personal knowledge and observation; but, that it was not permissible for them to give their opinions, based upon that knowledge and information — same being a conclusion of law, and not a matter for determination by expert testimony. To the judge’s declination to give the jury this special charge, no bill of exceptions was retained on behalf of the plaintiff, and the State is to be considered as having abandoned it and acquiesced in the charge that was given by the judge, and which is as follows, viz.:
“There is only one question for the jury to decide, and that is as to the character of the exhibitions given at the Olympic Olub.
* * * * * * *
“ The burden of proof is on the plaintiff' to make out its case. The defendant is charged here with having violated the terms and con•ditions of its charter by having given, under its auspices, what is-commonly called prize fights.
“ The defendant resists that charge on the ground of a proviso in the law which permits glove contests. There is then but one question before you, ‘ Does the evidence disclose that these exhibitions were prizefights or not; or does the evidence disclose that they were glove contests or not? ’ •
*949 “ Now the rule of interpretation of words is that they must be received according to their significance in common use.
“ I am not an expert, and can give you no opinion as to the significance of these words. You must determine for yourselves whether, in common parlance, these exhibitions were prize fights or glove contests. There is no other law in this case.”
No objection was made to this charge, and no bill of exceptions was retained by the plaintiff to it.
When the counsel for the State presented the aforesaid special charges, the judge declined to give the jury any other charge than the one above quoted — stating, however, that “this is not a criminal prosecution, but that it is a civil prosecution, for the forfeiture of defendant’s charter;” reading to the jury Act 25 of 1890.
The acquiescence of the plaintiff in the judge’s estimate of this controversy is plainly indicated by the paragraph we clipped from its brief, at page 10, which we reproduce in this connection for the purpose of emphasizing the correctness of the judge’s conclusions:
“ Were they not ‘ what is commonly called prize fights,’ and did not each fight constitute the crime or offence of assault and battery, and a breach of the peace, and were they not in violation of the law and public policy of the State? Or, were they lawful exhibitions of skill in boxing, permissible under the law; or, as the defendant is pleased to call them, 1 glove contests,’ whatever precisely that may mean?”
On the face of the statute against prize fighting — Act 25 of 1890— the denunciation of the law is against “ any person who shall send or cause to be sent, publish, or otherwise make known, a challenge to fight what is commonly called a prize fight ” — not a prize fight eo nomine.
And that denunciation is coupled with the proviso, “ that this act shall not apply to exhibitions and glove contests between human beings, which may take place within the rooms of regularly chartered athletic clubs.”
That is the only statute governing such contests, or exhibitions, to which we have been referred, or of which we are aware; and it is controlling, and conclusively affirms the correctness of the view entertained by the District Judge.
Accepting this as the correct theory of this case, it is manifest that the judge ruled correctly in admitting the evidence objected to, and *950 in refusing to give the special charge requested by plaintiff’s counsel. Por it can not be readily perceived on what theory expert testimony should have been excluded, when the main question for the jury to determine was the proper significance of “what is commonly called a prize fight,” as contradistinguished from a “ glove contest.”
Addressing ourselves to the definition of these terms, we are to ascertain the distinction between them in common parlance; that is to say, to ascertain their true significance in the vernacular of the prize ring and athletic club, where such exhibitions are given.
Taking the contract between Bowen and Abbott as a sample of the articles of agreement between the contestants before the Olympic Club, we find that it declares they “ do hereby agree to engage in a glove contest,”, and that it further stipulates that “ the contest (is) to be with five-ounce gloves, and according to Marquis of Queensbury rules.” It also provides that if either party shall “ commit a deliberate foul, thereby injuring the other’s chances of winning, the one so doing shall lose all interest in the aforesaid purse.”
City Ordinance No. 4336 provides “that exhibitions and glove contests between human beings, for the development of muscular strength, be and the same are hereby permitted to take place within the rooms of all regularly chartered athletic clubs in the City of New Orleans.” That ordinance provides further, that in such contests “ a glove weighing not less than five ounces shall be used.”
We have extracted from the little volume entitled Billy Edwards’ Art of Boxing and Manual Training, which was introduced and filed in evidence by the Attorney General, on the part of the plaintiff, as immediately bearing on the contracts of the Olympic Olub contestants, the Marquis of Queensbury rules.
The extract is from p. 109, and is as follows, to-wit:
THE MARQUIS OK QUEENSBURY RULES, FOR THE ENGLISH CHALLENGE CUPS (OPEN TO GENTLEMEN AMATEURS) .
* - * * * * * *
“ Rule 4. There are to be three judges appointed by the committee.
“ Rule 5. That the boxing is to take place in a 24-foot ring.
“ Rule 6. That no wrestling, roughing, or hugging the ropes (is • to) be allowed.
Rule 7. That each heat consists of three rounds, with one minute *951 interval between each; the duration of each round to be at the dis•cretion of the judges, but not to exceed five minutes.
“ Rule 8. Any competitor not coming up to time shall be deemed to have lost.
“ Rule 9. That no shoes or boots with spikes or sprigs be allowed.
* sfc * * # * *
“ Contests for Endurance.
“ Rule 1. To be a fair stand-up boxing match in a 24-foot ring, or ■as near that size as practicable.
“ Rule 2. No wrestling or hugging allowed. The rounds to be o4/ ■three minutes’ duration and one minute time.
“ Rule 3. If either man fall, through weakness or otherwise, he must get up unassisted, ten seconds to be allowed him to do so, the other man to retire meanwhile to his corner, and when the fallen man is on his legs the round is to be resumed, and continued until the three minutes have expired; and if one man fails to come to the scratch in the ten seconds allowed, it shall be in the power of the referee to give his award in favor of the other man.
“Rule 4. A man hanging on the ropes in a helpless condition, with his toes off the ground, shall be considered down. * * *
“ Rule 6. The gloves (are) to be fair-sized boxing gloves of] the best quality, and new,.
^ ^ iji J-t jjt
“ Rule 8. A man on one knee is considered down, and if struck, is entitled to the stakes.”
As contradistinguished from the foregoing, we refer to the manual •of Billy Edwards, at page 103 et seq., containing the London Prize Ring Rules, from which we find the only distinguishing features to be: (1) that the contests are made without gloves or other covering for the hands; (2) that the fighting boots of the contestants are provided with three metal spikes, which are one-eighth of an inch broad, and extend three-eighths of an inch from the sole, one to be placed on each side of the boot near the toe and the other at the heel; (3) that wrestling, roughing and hugging are not forbidden; all the prohibitions being attempts to inflict injury by gouging, tearing the flesh with the finger nails, and biting.
Contests under the London Prize Ring Rules are usually outdoors, in open, public view. ... ■ .... .
*952 With these rules kept in view, the evidence will disclose whetheithe Olympian contests were glove contests or prize fights, as the major part of the witnesses were connoisseurs in matters of this sort, if not experts, scientifically speaking.
The plaintiff only introduced four witnesses, gentlemen who had witnessed some of these contests as reporters of the newspapers, whose testimony was chiefly directed to the consequences of them rather than to the modus operandi of their management. But on this subject the evidence of the defendant is full, and therefrom we find the following summary of facts and extracts from the testimony of witnesses.
During the examination of one of the most prominent of the witnesses the following occurred, viz.:
“ Q,. Have you ever seen any of the contests at the Olympic Club, which are sometimes called glove contests, and which the State now calls prize fights?
“ A. I have seen several of them.
“ Q,. Can you mention any of the names of the contestants?
“ A. I saw the Sullivan-Corbett contest; I saw the Fitzsimmons-Maher contest, and I saw the contest between Bowen and Meyer, of Illinois.
“ Q,. Did you see the MeOarthy-Warren contest?
“ A. Yes, I saw that fight.
“ Q,. Take the Corbett-Sullivan fight and describe what you saw at that fight.
“ A. Well, I saw the gentlemen come into the ring and take the respective corners assigned to them and prepare themselves for the contest. They prepared themselves by divesting themselves of their clothing, except (their) trunks and shoes, and covering their hands with gloves. Then, after the other preliminary arrangements were made, under the rules and regulations governing the contest, time was called, and they were then engaged in their boxing contest.
“ They appeared in the centre of the ring and commenced the boxing exercise — boxing against each other the best way they could, in order to strike one another and to get what advantage they could, under the rules and regulations of the contest, by striking, parrying blows, dodging or retreating, doing all they could in that way to save themselves from injury and to administer injury to the opposite *953 party,'in a sporting and friendly manner, under the rules and regulations for that character of contest. (Our italics.)
“ I saw them through the contest, which consisted of twenty-one rounds of three minutes each.
“ They were required to remain contesting each round for three minutes. After each round they were given one minute’s rest, during which they were refreshed by their respective attendants; after which the contest was resumed for another three minutes, and so on until one or the other either surrendered, or was rendered incapable to the call of the contest.
“ Q. Do you know anything of what.is commonly called boxing?
“ A. Yes, sir.
“ Q,. Have you any skill in it yourself?
•“ A. Not a great deal; I have boxed some in former'years.
“Q. Do you feel competent to define the physical act that these men committed?
“A. I will say, then * * * that what I saw is what I would call boxing to determine the superior excellence, science and endurance of the parties to the contest. They were governed by certain rules and regulations which had been prescribed. And each contestant is compelled to conform to those rules and regulations, and while doing so they use all the skill and strength in their possession, each endeavoring to strike the other — using all the tactics in their possession in order to defend themselves from the blows of each other. And they do this, as I said before, by retreating, by dodging, and by parrying the blows. It is very seldom that either one of them gets a square, direct, hardblow, because the blow is either parried or dodged, or they retreat, or they close into each other, and lock arms, in order to protect themselves from the force of the blow. That is the case in the exercise of boxing, whether it is for fan, for a prize, or otherwise; it is the same character of exercise.
“ Q. You used the word ‘ skill; ’ what do you mean by that?
u A. I mean the skill, or science, or expertness of the parties to defend themselves, each from the blows of the other, and at the same time to strike the other. It is an exercise that is capable of' being carried to. a very high degree of skill and science, both in the manner of striking and in the manner of defending, retreating arid dodging — all of which make up the whole exercise.
*954 “Jt.is a, qontest for physical supremacy,-physical superiority, endurance, skill and strength. .......
“ Q. It is, also, called 'the manly art of self-defence,’ is it not?,
A. Yes. The manly art of self-defence. That is a comprehensive term applied to the art of boxing.
UQ. Did you. ever see a prize fight, commonly so-called?
•“A. Yes, sir.
Q. Which one did you see?
“A. I saw the Sullivan-Ryan fight. That is the only prize fight, that I ever saw.
“ Q,. Is there any difference between that contest and the contest you have seen in the Olympic Club?
“ A. I can state the facts, and what was done at' the contest between Sullivan and Ryan. They entered a ring similar to that of the other contests we have been speaking of, but they were differently prepared.
“ They had naked fists, and they continued the contests in a more severe manner, and continued the exercise until one or the other had.fallen or was knocked down. Then they were allowed to wrestle, and they were allowed to fall upon one another, when they did (fall). They were allowed to take advantage in their efforts to strike or injure each other. That they were not allowed (to do) in the other contests of which we have been speaking. Then, as soon as the round had been completed by either one of them falling, they then retired to their respective corners, but only had a half-minute’s rest, when time was called.
“ Q. (By the court) : That was in case of the Sullivan and Ryan contest?
“ A. Yes, sir. They only had a half a minute’s rest, after each round, and a round continued up to the point when either of them' fell; either, of his own volition, or' from the effect of a blow, a slap or a wrestle. The contest, continued in that way until one of them had gained sufficient superiority over the other to justify the other’s seconds to throw up the sponge.. That contest, I think, lasted seven rounds,, when the seconds of, Ryan, threw up the sponge — that is, simply surrendered the congest and admitted that Mr. Sullivan was the superior pugilist. ..... , . .
*955 ‡ ‡ ‡ •‘ft
“ Q,. Were the contestants arrayed as they were in the contests before the Olympic Club?
“ A. No. The shoes were heavier, and they were allowed to have ■spikes in their shoes, and their hands were not gloved.
$ $ :K $ $ * %
“Q. Did the Sullivan-Ryan contest that you speak of take place - in the open air?
“A. Yes; it took place in the open air.
:fs sft * *
!< Q. Were any of the contestants injured in any of those contests which you witnessed at the Olympic Club?
“A. In some cases they received slight injuries.
“Q. Whereabouts?
“A. In the Maher-Pitzsimmons fight, Maher received a slight injury by the bruising of his lip, and perhaps a little to the nose — sufficient to cause some little flow of blood. It is claimed quite a considerable of a flow of blood. I saw some blood, but I saw no serious injury.
“ Q,. You saw no serious injury to any one?
“A. I have never seen any one of the contestants seriously injured.
“ Q. Have you witnessed those contests from beginning to end?
“A. Yes; I have witnessed all the principal contests we have had 'here, from beginning to end.”
We have selected the testimony of this particular witness because of his being a typical representative of the conservative element of this community, the president of a college, and a man apparently possessed of accurate and careful information on the subject, as furnishing the most concise exposé of the Olympic Club contests, as he seems to have witnessed the greater number of them, and closely ■observed them from a scientific standpoint.
The next witness to whose evidence our attention has been attracted is a prominent city official, who states that he has seen nearly all of the contests at the Olympic Club — and specially mentions the Sullivan-Corbett contest.
He says that he witnessed the Sullivan-Ryan fight at Mississippi City, Miss., and Sullivan-Kilrain fight at Richburg, Miss., and says ¿hey were prize fights.
*956 “ Q. Now, will you kindly tell me what, if any, difference there was between that prize fight between Sullivan and Kilrain and the contest which you saw at the Olympic Club?
“A. Well, the rules for sparring contests are not observed in the London prize ring rules. For instance, in' a glove contest the rules require that when the contestants come together and clinch, they must separate, and if they do not, the referee separates them by force. But you can not do that under the London prize ring rules. Under the London prize ring rules the contestants can clinch, and stand and thump and punish until one or the other goes down. That is not tolerated in a glove contest. Then, under the London prize ring rules they are not limited as to the time they shall have for each round. In a glove contest they are. Then, under the London prize ring rules they wear spiked shoes, and in those contests they are not allowed to use them. Under the London prize ring rules they fight with the bare knuckles, while in these contests they must wear gloves weighing not less than five ounces,” etc.
The next witness whose testimony has attracted our notice is a prominent lawyer, who furnishes a like description of the Olympian contests as the first' witness did.
He says these contests were conducted with a high degree of skill, the participants exhibiting a great deal of skill. The men who participated in those contests were men of scientific training — almost without an exception. He does not think any of the contestants were hurt very much. He saw one or two of them bleeding from the nose or mouth, and possibly saw one bleeding from the ear. States that he witnessed the Sullivan-Kilrain fight in Mississippi, and describes it very much as the second witness does.
The next witness is a police commissioner, and he was present and witnessed most all of the contests which took place at the Olympic Club. Having heard the testimony of the last preceding witness he corroborates it in every particular. States that he considered the contest between Oorbett and Sullivan as one of the greatest fights that ever took place, as far as skill and science was concerned.
The next witness is a leading lawyer of the New Orleans bar. He states that he witnessed several of the Olympic Club contests, and instances the Corbett-Sullivan contest, which he describes much in the same manner as other witnesses have done. That he saw nothing that was objectionable or brutal in that contest. He testifies— *957 as other witnesses had done — that the assemblage of people who witnessed these contests was orderly and well behaved. Or, as the first witness states, these assemblages of people, in point of personal respectability and behavior, were above the average of ordinary political assemblages.
He states he heard the testimony of the third witness and corroborates it throughout. This witness is a member of the school board and a gentleman of first respectability.
The next witness is also a prominent city lawyer of high reputation and a man of affairs. He states that he has witnessed quite a number of the Olympic Olub contests, and his description of them and the manner in which they were conducted is quite the same as that of other witnesses whose testimony we have commented on.
His description of the effect of these contests upon the contestants, physically, is quite unique.
“ Q. The exhibitions which you have described, were they at any time bloody, or (was) blood shed during any of those contests?
“A. Well, when two men get opposite to each other and begin boxing, unless one has a pretty tough nose, there is going to be a' bloody nose. I have had a bloody nose myself twenty times when I was taking boxing lessons,” etc.
With regard to the cruelty or brutality of the Olympic contests, this witness’ statement is also quite unique.
“ Q. Was there anything brutal or inhuman about it?
“ A. In my judgment, no sir. As compared with that popular game nowadays (known) as foot-ball, which I think the American people have gone crazy about, the contests that I have seen at the Olympic Olub are superior in every respect, and in point of humanity and as appealing to the esthetic senses,” etc.
He states that the contestants were scientific and artistic in the management of their hands.
“ They were experts in boxing. It is commonly called the manly art of self-defence, both in England and in this country,”
Quite a number of other witnesses — lawyers, doctors and professional experts — were called and gave evidence quite in line with the statements we have detailed.
On the other hand, a fair summary of the testimony of the plaintiff ’s witnesses does not materially differ from that of the defendant’s, except as to the manner and result of these contests.
*958 One witness said that he saw blood running from the ear of one of the contestants in the Goddard-Smith contest — “ just a little.” He-' speaks of the Fitzsimmons-Maher fight'as a “bloody fight.” He says that in the Sullivan-Corbett contest Sullivan bled at the mouth' and nose. He says that in the McCarthy-Callaghan contest the lip of the former was much swollen. Another witness speaks of some of the contestants shedding blood, but his memory of details was not accurate. The case of Maher, in the contest with Fitzsimmons, is the only one about which he is at all positive.
The following cross-examination of this witness is worthy of note, as characterizing these contests, viz.:
“ Q. Did you see any of those men bite each other?
“ A. No, sir.
“ Q. Did you see them wrestle with each other, throw each other down, or jump on one another?
“ A. No, not intentionally.
“ Q. This butting you speak of on the part of Smith was accidentally (done), was it'not?
“ A; I don’t think he fought fairly.
“ Q. You don’t think he was a fair fighter?
“A. No, sir.
“ Q,. The referee had to stop him?
“A. They warned him two or three times about it.
“ Q. But there was no kicking of each other?
“A. No, sir.
“ Q. They fought, I understand, with five-ounce gloves?
“A. Yes.
• “ Q. They squared themselves for the fight, and from that moment on it was give and take?
“A. Yes.
“ Q. Each man trying to land his blows above a certain point?
“A. Yes.
“ Q. Above his belt?
“A. Yes.
•' “ Q. And they used their hands and nothing but their hands, until the gong struck ‘time ’ for the fighting to end?
“ Q. And the round lasted three minutes?
- “A. Yes.”
The testimony of the other witnesses of the plaintiff is much Qf the: *959 same tenor as that of the two whose evidence we have quoted, ánd' and little is left: us to say in the way of comment. We have only to answer for ourselves the question the judge’s charge propounded to the jury. Does the evidence show that these exhibitions were what are commonly called prize fights or glove contests? We are to make answer to the questions propounded by the State .of Louisiana through her Attorney General, viz.: Were these contests 'what are commonly called prize fights? and did each fight constitute an assault and battery, and a breach of the peace? and xvefe they not in violation of the law and the public policy of the State?' ■
Or were they lawful exhibitions of skill in boxing, permissible under the law? or, as the defendant puts it, glove contests recognized by law? '
We have only to recur to the instructions that plaintiff’s counsel requested the Judge to give in charge to the jury, for a guide, in making answer to these queries. ■ :
They say: 1 • If it were a mere exhibition of skill in sparring with gloves, not calculated to do great bodily injury, it' was a glove contest, within the provision of the law.”
They further say: “ Gentlemen of the jury, you are to decide this case from the evidence adduced on the witness stand as to what"actually occurred at the time the several contests or fights referred to in the petition, and testified to by witnesses (took place), and not by your preconceived opinions, or the opinions of any other person, as. to whether these were prize fights or not. In other words,' you are to'decide this' ease upon the facts proven by the testimony of the witnesses on the stand, and the law, as given you by tile Court, and not in accordance with your preconceived opinions or the opinibtiS of anyone else.” (Our italics.) ■'
Testing the issue presented by the 'evidence 1 we have detailed— and it is of a kind that all of the evidence, is — and the law as given by the court (and that was the reading to the jury of Act 25 of 1890) and there is only one conclusion to which we could come',' and that is the oné at which the jury arrived, to-wit: that the Olympic Club contests were ordinary glove contests within the terms of that statute, ánd not u what are commonly called prize fights.”
■ Coming within the provisions of a Special'statute, such' contests could not be esteemed assaults.and batteries, or as breaches of the peace, unless the evidence should disclose that they were calculated *960 “ to do great bodily injury.” But the evidence will be examined in vain for any such proof; for its substance and general tenor is to the effect that these contests were but trials of the skill and powers of physical endurance between well-equipped athletes, and that, being trained in this so-called “manly art of self-defence,” it was a. matter next'to an impossibility for one of the contestants to administer, “above the belt” of the other, any serious physical punishment — fighting, as they did, with five-ounce gloves. That anose was occasionally made to bleed, that now and then a lip was left in a swollen condition, or the face somewhat bruised and disfigured, does not alter, the case, as like occurrences are apt to take place in boxing, fencing or in foot-ball.
As the State of Louisiana is in court seeking the forfeiture of the defendant’s charter on the ground that the corporation has committed acts ultra vires of its charter,, and. is met with the provisions of an act of her own Legislature which in terms authorizes just such contests as the witnesses describe the Olympic contests to have been, this Court must be excused for declining to disturb the finding of the jury on the facts in favor of the defendant.
. If, indeed,.such contests are violative of good morals and a-sound public policy, the matter comes plainly within the prerogative of the legislative department of the government, which alone can be looked to for relief.
As the suit is sui generis, the decision of which depends upon the interpretation of a special statute of this State, authorities and decisions of the courts of other States and countries would be examr ined in vain; for the question is one of fact.
Judgment affirmed.
Mr. Justice Miller takes no part in this opinion, not being a member of the-Court at the time the cause was argued and submitted.